# UNITED CABLE TELEVISION SERVICES CORPORATION *v.* DEPARTMENT OF PUBLIC UTILITY CONTROL ET AL.
## (15125)

Peters, C. J., and Callahan, Borden, Katz and Palmer, Js.

Argued May 24—decision released August 22, 1995

*Robert P. Knickerbocker, Jr.*, with whom, on the brief, was *Paul N. Belval*, for the appellant (plaintiff).

*Tatiana D. Sypko*, assistant attorney general, with whom were *Robert S. Golden*, assistant attorney general, and, on the brief, *Richard Blumenthal*, attorney general, for the appellee (named defendant).

*David Silverstone*, with whom was *William B. Heinrich*, for the appellee (defendant The FiberVision Corporation of Greater Hartford).

*Phyllis J. Trowbridge*, for the appellee (defendant office of consumer counsel).

CALLAHAN, J. The plaintiff, United Cable Television Services Corporation, doing business as TCI Cablevision of Central Connecticut, appeals from the judgment of the trial court dismissing its appeal from the decision of the defendant, the department of public utility control (department), to grant the defendant, The FiberVision Corporation of Greater Hartford (FiberVision), a competing cable company, a certificate of public convenience and necessity. The plaintiff claims that the trial court improperly determined that: (1) the plaintiff, as the existing cable provider for the towns of Bloomfield, East Hartford, Hartford, Simsbury, West Hartford and Windsor (area no. 10), was not aggrieved by the granting of a certificate of public convenience and necessity by the department to a potential competitor

in alleged violation of General Statutes § 16-331 (b),
(d) and (h);[1] (2) although the plaintiff was aggrieved

[1] General Statutes § 16-331 provides in relevant part: "(b) In determining
whether a new certificate shall be issued or an existing certificate transferred,
the department of public utility control shall only take into consideration
the suitability of the applicant or, if the applicant is a corporation, of its
management, the financial responsibility of the applicant and the ability of the
applicant to perform efficiently the service for which authority is requested. In
the case of an application filed on or after October 1, 1981, (1) if the applicant
or an affiliate thereof is the holder of one or more other certificates in the
state, the department shall also consider the possible adverse effects of
increasing the concentration of ownership of community antenna television
systems and related services, which would result from granting the application
and (2) suitability of the applicant shall include consideration of participating
owners resident in the proposed service area as well as involvement in local
civic and community activities. In considering concentration of ownership
the department shall only take into account the following factors: (A) Federal
and state antitrust and unfair trade practices laws, regulations and policies
and (B) the reduced ability of the department to make comparisons with
other certificate holders. In the case of an application filed on or after Janu-
ary 1, 1983, for the approval of the transfer of an existing certificate, the
department shall also (i) consult with the advisory council established by
regulation for the franchise area specified in the certificate and, (ii) if the
applicant or an affiliate thereof is the holder of one or more other certificates
in the state, consider the adequacy of the service provided by such holder
in the franchise areas specified in such certificate or certificates. The depart-
ment may adopt regulations in accordance with chapter 54 to carry out the
purposes of this subsection. . . .

"(d) (1) An initial certificate issued prior to June 1, 1988, shall grant a
franchise for fifteen years . . . . An initial, renewal or transfer certificate
issued on or after June 1, 1988, shall grant a franchise for a term of not less
than five years and not more than ten years, except that under special
circumstances, as described in subdivision (2), a franchise may be granted
for a term of more than ten years but not more than fifteen years. The
department shall have the discretion to determine the appropriate length of
a franchise term, initial, renewal or transfer, and in making its decision shall
consider the following without limitation: (A) The operator's past perfor-
mance in terms of meeting the needs of the cable-related community; (B)
the operator's past performance in terms of complying with the material terms
of the existing franchise; (C) the operator's compliance with the department
regulations and the general statutes; (D) the ability of the operator's manage-
ment to properly operate the franchise; (E) the operator's effectiveness in
dealing with consumer requests, complaints and billing questions or disputes;
(F) the operator's effectiveness in dealing with the advisory council; (G) the
quality and diversity of the operator's programming; (H) the quality of the
operator's community access programming, including public access, educa-
tional access and governmental access programming, in accordance with the
provisions of subdivision (3) of this subsection; (I) the quality of the operator's

pursuant to § 16-331-(i), [2] it is not entitled to review of all its claims on appeal; and (3) its claim pursuant to § 16-331 (i) should be dismissed because of its failure

equipment and facilities; (J) the operator's proposals for future extensions and upgrading to technologically advanced equipment, facilities and systems; (K) the operator's past performance in terms of meeting the needs of the cable-related community by providing African-American and Hispanic programming; (L) the operator's good faith efforts, as determined by the department, to provide service, when practicable, to all customers within the service area; (M) the operator's past performance in making available addressable converters, traps or other devices or services which enable subscribers to voluntarily block transmission of specific programming to their homes or places of business, and (N) the applicant's provision of innovative services, including audio services, information services, electronic publishing and information concerning the proceedings of the general assembly and legislative committees.

"(2) Under special circumstances, the department in its discretion, may issue, renew or transfer a franchise for a term of not more than fifteen years if the franchisee has committed itself, as outlined in the franchise agreement, to provide or maintain technologically advanced equipment, facilities and systems, as determined by the department, to enhance and promote technologically advanced educational programming, including the programming specified in subsection (b) of section 10-4e, and to comply with specific quality of service standards, including, but not limited to, the time between installation and repair following a subscriber request, the response time to consumer complaints and the quality of the operator's customer service policies and practices. . . .

"(h) Each applicant for a certificate shall finance the reasonable costs of a community needs assessment, conducted by an independent consultant and developed jointly by the department, the Office of Consumer Counsel, the local advisory council and the applicant, which assessment shall analyze a community's future cable-related needs and, if applicable, shall provide the department with assistance in analyzing an operator's past performance as defined in subsection (d) of section 16-333*l*. The department shall supervise the assessment and provide the independent consultant with the date upon which the assessment shall be completed and filed with the department. Such community needs assessment shall be conducted in lieu of the requirement in subdivision (12) of subsection (c) of section 16-333-39 of the regulations of Connecticut state agencies. . . . "

[2] General Statutes § 16-331 (i) provides: "Each certificate of public convenience and necessity for a franchise issued pursuant to this section shall be nonexclusive, and each such certificate issued for a franchise in any area of the state where an existing franchise is currently operating shall not contain more favorable terms or conditions than those imposed on the existing franchise. This subsection shall not apply to the length of the term of such certification as may be determined pursuant to subsection (d) of this section."

to provide an adequate record. We are not persuaded by the plaintiff's arguments, and affirm the judgment of the trial court.

The record reveals the following undisputed facts. On July 8, 1993, FiberVision applied to the department for a certificate of public convenience and necessity pursuant to General Statutes § 16-331 and § 16-1-86 of the Regulations of Connecticut State Agencies.[3] The

[3] Section 16-1-86 of the Regulations of Connecticut State Agencies provides: "Special components

"If the application concerns the granting of a certificate that public convenience and necessity require the operation of any proposed community antenna television system within the territory specified in such certificate in the manner described in section 16-331 of the general statutes, then there shall be annexed to the application:

"(a) Statement describing in detail the territory wherein the applicant proposes to furnish such service.

"(b) Such map, engineer's drawings and other form of illustration as shall be necessary to describe the scope and nature of the service that is the subject of the application, as well as the equipment with which such service is to be furnished.

"(c) A statement of the financial condition of the applicant.

"(d) Names and addresses of all persons owning ten (10) percent or more of the outstanding debt or equity of the applicant. If the named applicant is the trustee, agent or nominee of any person, such statement shall also include the name and address of each person for whom the applicant is acting as such trustee, agent or nominee in presenting the application.

"(e) Description of the services and conditions of service that applicant proposes.

"(f) Statement of proposed rules, tariffs, and schedule of rates under which such service will be supplied by applicant.

"(g) Description of equipment with which applicant proposes to furnish such service, together with itemized statement of the cost of said equipment to the applicant.

"(h) Proposed timetable for commencing to furnish such service after application is approved.

"(i) Description of street wiring applicant proposes to undertake within the first two years of operation, together with a breakdown of the proposed cost of installation of such street wiring.

"(j) Pro forma balance sheet as of date when applicant commences operations.

"(k) Pro forma income statement for applicant's first ten (10) years of operations under proposed tariff and schedule of rates.

"(l) Copies of any contracts, leases, or other commitments proposed or

award of the certificate would allow FiberVision to overbuild[4] the plaintiff's franchise area and provide cable television service to those towns previously served only by the plaintiff.[5] The plaintiff requested and was granted party status in the application proceedings, to which the office of consumer counsel[6] and the state's attorney general were also parties.

Pursuant to a notice of hearing dated August 30, 1993, the department conducted public hearings on Fiber-Vision's application on September 20, and October 7, 8 and 18, 1993. On January 20, 1994, the department distributed a draft decision. After providing all parties and intervenors a right to participate in oral argument concerning the draft decision, the department issued a final decision on February 16, 1994, granting FiberVi-

---

existing between the applicant and any supplier of equipment or of services in any form whatsoever that will affect the construction of operation of the proposed system

"(m) Statement listing names and addresses of all management and principal staff personnel, and setting forth their qualifications to construct and operate the system efficiently."

[4] " 'Overbuild' refers to a situation in which a second cable television operator wires the same streets and competes head-to-head for subscribers with the operator [that] first served the area." *Nishimura* v. *Dolan*, 599 F. Sup. 484, 489 n 4 (E.D.N.Y. 1984).

[5] Despite the fact that the department has had the authority to grant more than one certificate to serve a particular area since 1985, FiberVision's was the first application filed with the department that sought to provide direct competition to an existing cable provider.

[6] The office of consumer counsel is an independent entity within the department authorized "to act as the advocate for consumer interests in all matters which may affect Connecticut consumers with respect to public service companies . . . . The Office of Consumer Counsel is authorized to appear in and participate in any regulatory or judicial proceedings, federal or state, in which such interests of Connecticut consumers may be involved, or in which matters affecting utility services rendered or to be rendered in this state may be involved. The Office of Consumer Counsel shall be a party to each contested case before the department of public utility control and shall participate in such proceedings to the extent it deems necessary. . . ." General Statutes § 16-2a (a). "Nothing in this section shall be construed to prevent any party interested in such proceeding or action from appearing in person or from being represented by counsel therein." General Statutes § 16-2a (e)

sion's application for a certificate of public convenience and necessity.[7]

Pursuant to General Statutes §§ 16-35 and 4-183,[8] the plaintiff appealed to the trial court from the final decision of the department. FiberVision claimed, by way of a special defense, that the plaintiff was not aggrieved by the decision of the department and therefore lacked

[7] The draft decision and the final decision were identical and imposed the following terms and conditions on FiberVision's franchise agreement: (1) the franchise agreement must include a description of the cable system with fiber nodes serving 500 homes with a channel capacity of seventy-eight; (2) construction is to begin within six months of the franchise award with service available three months after construction begins; (3) the customer services must include a commitment to satisfy requests for installation on the same day if possible but within three days at a maximum, and rates charged for programming and services must be "competitive"; (4) the franchise must include a commitment to fund public access at the rate of $2 per subscriber per year for the first 30,000 subscribers and $3 per subscriber per year for additional subscribers; (5) the franchise must contribute $2000 per year to help support the advisory council for its area; (6) the franchise must negotiate a public access agreement with Community Access Television Corporation as well as specific agreements with media centers and educational institutions; (7) FiberVision shall, within ninety days, file evidence that financing has been committed and that ownership, corporate and board structures have been formalized prior to commencing construction; (8) FiberVision shall, within ninety days, finance a needs assessment; (9) FiberVision must begin construction of its energized trunk and feeder lines within six months and construct not fewer than 150 miles of energized trunks and feeders per year for each of the first three years of the franchise; and (10) FiberVision must complete construction of its entire system within twelve years.

[8] General Statutes § 16-35 provides: "Appeals to superior court. Any company, town, city, borough, corporation or person aggrieved by any order, authorization or decision of the department of public utility control, except an order, authorization or decision of the department approving the taking of land, in any matter to which he or it was or ought to have been made a party, may appeal therefrom in accordance with the provisions of section 4-183. The party so appealing shall give bond to the state, with sufficient surety, for the benefit of the adverse party, in such sum as the department fixes, to pay all costs in case he or it fails to sustain such appeal."

General Statutes § 4-183 provides in relevant part: "Appeal to superior court. (a) A person who has exhausted all administrative remedies available within the agency and who is aggrieved by a final decision may appeal to the superior court as provided in this section. The filing of a petition for reconsideration is not a prerequisite to the filing of such an appeal."

standing to pursue the appeal. The trial court dismissed the plaintiff's appeal, concluding that subject matter jurisdiction existed only as to the plaintiff's claims pursuant to § 16-331 (i), because the plaintiff had been unable to establish aggrievement as to any of its other claims. The court then dismissed the plaintiff's claims pursuant to § 16-331 (i) because the plaintiff had failed to present an adequate record for review. The plaintiff appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c). We affirm the judgment of the trial court.

I

The plaintiff first claims that it was aggrieved by the department's granting of a certificate of public convenience and necessity to its potential competitor. "It is fundamental that appellate jurisdiction in administrative appeals is created only by statute and can be acquired and exercised only in the manner prescribed by statute." *Munhall* v. *Inland Wetlands Commission*, 221 Conn. 46, 50, 602 A.2d 566 (1992); see *Charles Holdings, Ltd.* v. *Planning & Zoning Board of Appeals*, 208 Conn. 476, 479, 544 A.2d 633 (1988). An appeal from an administrative decision of the department is governed by § 16-35 and the Uniform Administrative Procedure Act; General Statutes §§ 4-166 through 4-189. *Office of Consumer Counsel* v. *Dept. of Public Utility Control*, 234 Conn. 624, 635–36, 662 A.2d 1251 (1995); see *Connecticut Light & Power Co.* v. *Dept. of Public Utility Control*, 219 Conn. 51, 57, 591 A.2d 1231 (1991).[9]

---

[9] We recently have held that "§ 16-35 places the burden on the appellant to establish in the Superior Court that it was made an actual party *or* that it should have been made an actual party to the proceedings of the [department] from which it seeks to appeal." (Emphasis in original.) *Office of Consumer Counsel* v. *Dept. of Public Utility Control*, supra, 234 Conn. 648. Because the plaintiff was made an actual party to the proceedings of the department in this case, it satisfies the party requirement of § 16-35.

"Pleading and proof of aggrievement are prerequisites to a trial court's jurisdiction over the subject matter of an administrative appeal. *Bakelaar* v. *West Haven*, 193 Conn. 59, 65, 475 A.2d 283 (1984). It is [therefore] fundamental that, in order to have standing to bring an administrative appeal, a person must be aggrieved. *Connecticut Business & Industry Assn., Inc.* v. *Commission on Hospitals & Health Care*, 214 Conn. 726, 729, 573 A.2d 736 (1990); *Beckish* v. *Manafort*, 175 Conn. 415, 419, 399 A.2d 1274 (1978). Standing [however] is not a technical rule intended to keep aggrieved parties out of court; nor is it a test of substantive rights. Rather it is a practical concept designed to ensure that courts and parties are not vexed by suits brought to vindicate nonjusticiable interests and that judicial decisions which may affect the rights of others are forged in hot controversy, with each view fairly and vigorously represented. See, e.g., *Baker* v. *Carr*, 369 U.S. 186, 204, 82 S. Ct. 691, 7 L. Ed. 2d 663 (1962); *Stern* v. *Stern*, 165 Conn. 190, 192, 332 A.2d 78 (1973). . . . *Board of Pardons* v. *Freedom of Information Commission*, 210 Conn. 646, 648–49, 556 A.2d 1020 (1989)." (Internal quotation marks omitted.) *Light Rigging Co.* v. *Dept. of Public Utility Control*, 219 Conn. 168, 172, 592 A.2d 386 (1991).

The test for aggrievement long recognized by this court is set forth in our decision in *State Medical Society* v. *Board of Examiners in Podiatry*, 203 Conn. 295, 524 A.2d 636 (1987). There we stated that "[t]he fundamental test for determining aggrievement encompasses a well-settled twofold determination: first, the party claiming aggrievement must successfully demonstrate a specific personal and legal interest in the subject matter of the decision, as distinguished from a general interest, such as is the concern of all members of the community as a whole. Second, the party claiming aggrievement must successfully establish that this spe-

cific personal and legal interest has been specially and injuriously affected by the decision . . . . *Cannavo Enterprises, Inc.* v. *Burns,* 194 Conn. 43, 47, 478 A.2d 601 (1984); *Bakelaar* v. *West Haven,* 193 Conn. 59, 65, 475 A.2d 283 (1984). Aggrievement is established if there is a possibility, as distinguished from a certainty, that some legally protected interest . . . has been adversely affected. *O'Leary* v. *McGuinness,* 140 Conn. 80, 83, 98 A.2d 660 (1953). *Hall* v. *Planning Commission,* 181 Conn. 442, 445, 435 A.2d 975 (1980)." (Internal quotation marks omitted.) Id., 299–300. "The determination of aggrievement presents a question of fact for the trial court and a plaintiff has the burden of proving that fact." *Mystic Marinelife Aquarium, Inc.* v. *Gill,* 175 Conn. 483, 493, 400 A.2d 726 (1978).

The trial court concluded that the plaintiff satisfied the first prong of the aggrievement test. The plaintiff demonstrated its specific personal and legal interest in the subject matter of the department's decision by alleging and proving to the trial court's satisfaction that it was a franchise holder in the area to which the contested franchise applies. Furthermore, the plaintiff's franchise is saleable and transferable and has substantial economic value. See General Statutes § 16-331 (a). A party, however, must have more than merely a specific personal and legal interest in the subject matter in order to satisfy the aggrievement test. A party claiming aggrievement also must demonstrate that its asserted interest has been specially and injuriously affected in a way that is cognizable by law. See *State Medical Society* v. *Board of Examiners in Podiatry,* supra, 203 Conn. 300–301.

In the present case, the plaintiff's claimed injury arises from the allegedly harmful effect on its business that it claims will result from the introduction of a direct competitor into the cable television market in area no. 10. As a general rule, allegations "that a governmen-

tal action will result in competition harmful to the complainant's business would *not* be sufficient to qualify the complainant as an aggrieved person." (Emphasis added.) Id., 301; see *Gregorio* v. *Zoning Board of Appeals*, 155 Conn. 422, 426, 232 A.2d 330 (1967); *Whitney Theatre Co.* v. *Zoning Board of Appeals*, 150 Conn. 285, 288, 189 A.2d 396 (1963); *London* v. *Planning & Zoning Commission*, 149 Conn. 282, 284, 179 A.2d 614 (1962). We have carved out a limited exception to this rule, however, that will permit a finding of aggrievement if the proposed competition is unfair or illegal. *State Medical Society* v. *Board of Examiners in Podiatry*, supra, 203 Conn. 302–303.

The plaintiff claims that it has been injured in that the competition proposed by FiberVision is illegal because the department granted a certificate of public convenience and necessity to FiberVision in violation of § 16-331. In *Light Rigging Co.* v. *Dept. of Public Utility Control*, supra, 219 Conn. 168, we considered a similar claim. In *Light Rigging Co.*, the department had granted a certificate of public convenience and necessity to a competitor of the plaintiffs. The plaintiffs held similar certificates to transport small machinery and accessories in Connecticut. In determining whether the plaintiffs were aggrieved by the department's decision, we were persuaded that the plaintiffs had satisfied the first prong of the aggrievement test, and that "[b]ecause [the statute at issue] expressly requires the [department] to consider public need for the services to be rendered by an applicant before granting a certificate . . . existing certificate holders are entitled to be free of competition for which no need has been shown." Id., 177. We concluded, therefore, that the plaintiffs were aggrieved. Thus, in considering whether a plaintiff's interest has been injuriously affected by the granting of a certificate of public convenience and necessity, we have looked to whether "the injury he complains of (*his* aggrievement, or the adverse effect *upon him*) falls

within the zone of interests sought to be protected by the statutory provision whose violation forms the legal basis for [its] complaint." (Emphasis in original.) *Air Courier Conference* v. *Postal Workers*, 498 U.S. 517, 523, 111 S. Ct. 913, 112 L. Ed. 2d 1125 (1991), citing *Lujan* v. *National Wildlife Federation*, 497 U.S. 871, 883, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990).

General principles of standing support the analysis we employed in *Light Rigging Co.* "Standing concerns the question whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question. [*Assn. of Data Processing Service Organizations, Inc.* v. *Camp*, 397 U.S. 150, 153, 90 S. Ct. 827, 25 L. Ed. 2d 184 (1970)]; *Ducharme* v. *Putnam*, 161 Conn. 135, 139, 285 A.2d 318 (1971); *Maloney* v. *Pac*, 183 Conn. 313, 320–21, 439 A.2d 349 (1981)." (Internal quotation marks omitted.) *State* v. *Nardini*, 187 Conn. 109, 113, 445 A.2d 304 (1982); *Mystic Marinelife Aquarium, Inc.* v. *Gill*, supra, 175 Conn. 483; see *New England Rehabilitation Hospital of Hartford, Inc.* v. *Commission on Hospitals & Health Care*, 226 Conn. 105, 126, 627 A.2d 1257 (1993) (applying zone of interests analysis); *State* v. *Pierson*, 208 Conn. 683, 687, 546 A.2d 268 (1988), cert. denied, 489 U.S. 1016, 109 S. Ct. 1131, 103 L. Ed. 2d 193 (1989) (standing "merely requires the party to make allegations of a colorable claim of injury to an interest which is arguably protected or regulated by the statute or constitutional guarantee"); see also *New Haven* v. *Public Utilities Commission*, 165 Conn. 687, 702, 345 A.2d 563 (1974) ("[i]t is now settled that standing to maintain an action in the federal courts requires proof of 'injury in fact' to an interest within the 'zone of interests' sought to be protected by the federal statute in question").

Pursuant to § 16-331, a successful application for a certificate of public convenience and necessity involves

a two-pronged inquiry by the department. The department first must determine whether the applicant is suited to render the particular service that the applicant proposes. General Statutes § 16-331 (b). If the department finds an applicant to be well suited to the task the applicant proposes to undertake, it then must determine the appropriate conditions to be placed upon the applicant in initiating and operating its franchise. General Statutes § 16-331 (c) through (j). Our review of the applicable legislation leads us to conclude that those statutory obligations of the department are meant to protect the public at large and not the interests of individual competitors. An existing competitor, not being within the zone of interests protected, has no standing to raise claims as to the general fitness of an applicant. We are persuaded, therefore, that the trial court properly determined that the plaintiff has standing only to raise claims regarding the terms of competition pursuant to § 16-331 (i), and has no standing to raise claims pursuant to § 16-331 (b), (d) or (h).

A

The plaintiff first claims that it was aggrieved by the department's alleged failure to comply with the requirements set forth in § 16-331 (b), which provides that, "[i]n determining whether a new certificate shall be issued or an existing certificate transferred, the department of public utility control shall only take into consideration the suitability of the applicant or, if the applicant is a corporation, of its management, the financial responsibility of the applicant and the ability of the applicant to perform efficiently the service for which authority is requested." Of these three considerations, the plaintiff alleges that two—financial responsibility and ability to perform efficiently—were given insufficient consideration by the department. We need not analyze the merits of these claims, however, because

we conclude the plaintiff has no standing to vindicate the interests protected by § 16-331 (b).

We find no support either in the language of the statute or in its legislative history for the proposition that the statutory requirements of § 16-331 (b) for the granting of a franchise are intended to protect existing franchise holders from potential competitors. Rather, we are persuaded that the legislature, by enacting § 16-331 (b), intended to protect the cable consuming public at large from inefficient and ineffective cable service.

Section 16-331 (b) provides that the department "shall *only* take into consideration" the criteria listed therein. (Emphasis added.) See footnote 1. The potential effect on existing franchises is not one of the listed criteria. When our legislature has sought to include effects on existing businesses as a criterion for determining whether to issue a certificate, it has demonstrated its ability to do so. For instance, General Statutes § 13b-392,[10] requires the department of transportation to consider "the existing motor transportation facilities and the effect upon them of granting [a] certificate

---

[10] General Statutes § 13b-392 provides: "Considerations for granting certificate. In determining whether or not such a certificate shall be granted, the commissioner of transportation *shall take into consideration the existing motor transportation facilities and the effect upon them of granting such certificate*, the public need for the service the applicant proposes to render, the suitability of the applicant, or the suitability of the management if the applicant is a corporation, the financial responsibility of the applicant, the ability of the applicant efficiently to perform the service for which authority is requested, the condition of and effect upon the highways involved and the safety of the public using such highways. The commissioner shall take into consideration such recommendations as to motor transportation facilities, or highways, or the effect of granting such certificate upon either of them, or the safety of the public using such highways. No such certificate shall be denied solely on the ground that there is an existing rail or motor service. When it appears that no motor common carrier service is being supplied over the route or routes applied for, public convenience and necessity shall be presumed to require operation of such service." (Emphasis added.) General Statutes (Rev. to 1985) § 16-286, recodified as § 13b-392, was at issue in *Light Rigging Co* v. *Dept. of Public Utility Control*, supra, 219 Conn. 176.

. . . ." Section 16-331 (b) reflects no such concern with the effects upon potential competitors.

The legislative history of § 16-331 (b) is equally unavailing to the plaintiff. There are affirmative indications in the 1963 legislative debates surrounding the precursor of § 16-331 (b), Public Acts 1963, No. 425,[11] which initially provided guidelines for the granting of certificates to operate community antenna television systems, that the legislature did not intend to protect existing cable franchises from competition, but rather thought licensing decisions should be based on the public interest. In the Senate, an amendment was proposed that would have made it mandatory for the certifying body to consider "the effect of the proposed service upon existing television stations in the State of Connecticut which provide television service within the general area which the applicant proposes to serve." This amendment was defeated, however, after a brief debate on the floor, and the act was passed without reference to the effect on existing certificate holders. 10 S. Proc., Pt. 8, 1963 Sess., pp. 2787–91. In the House of Representatives, the sole representative to comment on No. 425 of the 1963 Public Acts concluded his remarks by stating: "By this bill we believe the Committee has provided appropriate legislation *for the protection of the public interest* in locations where this new service may become available." (Emphasis added.) 10 H.R. Proc., Pt. 9, 1963 Sess., p. 3364, remarks of Representative Ralph J. Brown.

The plain language of the statute and its legislative history indicate that the public, as consumers of cable

---

[11] Section 3 of No. 425 of the 1963 Public Acts was the predecessor of current General Statutes § 16-331 (b) and provided: "In determining whether a certificate shall be granted, the commission shall take into consideration the public need for the proposed service, the suitability of the applicant or, if the applicant is a corporation, of its management, the financial responsibility of the applicant and the ability of the applicant to perform efficiently the service for which authority is requested."

television, and not competing certificate holders, was the sole class intended to be protected by § 16-331 (b). The plaintiff cannot establish that its claimed injury is protected by § 16-331 (b) and, therefore, does not have standing to raise claimed violations of that statutory provision.

## B

The plaintiff also claims aggrievement with regard to the length of the term of FiberVision's franchise. The department's decision provided that FiberVision would be granted a fifteen year franchise pursuant to § 16-331 (d).[12] Section 16-331 (d) contains a list of fourteen factors to be considered when determining the length of the term of a franchise. Noticeably absent from that list of factors is the effect on existing competitors in the same market.[13]

Section 16-331 (d) (2), pursuant to which the department may grant a franchise term for up to fifteen years, also indicates that Connecticut consumers are the class intended to be protected by the statute. Section 16-331 (d) (2) provides that in determining whether a cable operator should receive the benefit of the extended fifteen year franchise term, the department should consider whether "the franchisee has committed itself, as outlined in the franchise agreement, to provide or maintain technologically advanced equipment, facilities and systems, as determined by the department, to enhance and promote technologically advanced educational programming, including the programming specified in subsection (b) of section 10-4e, and to comply with specific quality of service standards, including, but not limited

---

[12] See footnote 1.

[13] Furthermore, § 16-331 (i), which prohibits more favorable franchise terms for new competitors, specifically provides that it "shall not apply to the length of the term of . . . certification as may be determined pursuant to subsection (d) of this section."

to, the time between installation and repair following a subscriber request, the response time to consumer complaints and the quality of the operator's customer service policies and practices." These criteria clearly are aimed at increasing the quality of cable television service to Connecticut consumers rather than protecting the financial interests of existing franchise holders.

The legislative history of No. 88-202, §§ 1, 10, of the 1988 Public Acts (P.A. 88-202), which amended § 16-331 (d), further supports our conclusion that injury to existing cable providers is not one of the interests sought to be protected by § 16-331 (d) as it relates to the granting of a fifteen year franchise term under certain circumstances. In the Senate debates concerning P.A. 88-202, Senator Gary A. Hale stated that the public act would "set forth what we call a bill of rights *for cable customers.* . . . I think this bill is a responsible way of *protecting cable customers* who have long been denied this kind of protection in Connecticut . . . . I think it is a major step forward *for cable customers* throughout our state." (Emphasis added.) 31 S. Proc., Pt. 5, 1988 Sess., pp. 1659–61. Senator Mark H. Powers remarked that P.A. 88-202 would "begin to put some teeth into state laws, so that we can make sure that cable companies are going to be responding to *the needs of our constituents.*" (Emphasis added.) 31 S. Proc., Pt. 5, 1988 Sess., p. 1664. In the House of Representatives debates, Representative Raymond M. H. Joyce remarked that P.A. 88-202 "sets detailed performance standards on cable TV companies *to improve service.*" (Emphasis added.) 31 H.R. Proc., Pt. 16, 1988 Sess., p. 5395. Representative Robert F. Frankel added that "[t]he bill . . . contains a rather sweeping set of *consumer protections* which I think are well advised in the circumstances . . . ." (Emphasis added.) Id., p. 5400. As with the protections of § 16-331 (b), we conclude that, in enacting § 16-331 (d), the

legislature contemplated protection of consumer interests only and, therefore, the plaintiff, as an existing competitor, has no standing to raise claimed violations of § 16-331 (d).

C

The plaintiff also claims that it was aggrieved by the department's decision to allow FiberVision to finance the community needs assessment required pursuant to § 16-331 (h) after, rather than before, the department granted a certificate. Section 16-331 (h) provides in relevant part that "[e]ach applicant for a certificate shall finance the reasonable costs of a community needs assessment, conducted by an independent consultant and developed jointly by the department, the Office of Consumer Counsel, the local advisory council and the applicant, which assessment shall analyze a community's future cable-related needs . . . ." Without deciding whether the plaintiff is correct in its assertion that the department may not grant, under any circumstances, a certificate without *prior* financing of a community needs assessment by the applicant, we again conclude that the public is the party intended to be protected by this statute and, therefore, the plaintiff cannot be heard to complain of any alleged discrepancies between the department's procedures and the statute.

As we noted in our discussion of § 16-331 (b), the legislature has demonstrated an ability to protect existing competitors when it chooses to do so. For instance, the statute that was at issue in *Light Rigging Co.* requires the department to consider "the existing motor transportation facilities and the effect upon them of granting [a] certificate, [and] the public need for the service the applicant proposes to render . . . ." General Statutes § 13b-392; see footnote 10. In *Light Rigging Co.*, "since the possibility exist[ed] that the alleged loss of business and diminution in value of the plaintiffs'

certificates would result from competition for which no need exists," we concluded that *"under [that] particular statutory administrative scheme,"* the plaintiffs had standing. (Emphasis added.) *Light Rigging Co.* v. *Dept. of Public Utility Control,* supra, 219 Conn. 176, 177. The statutory scheme presently at issue, however, unlike that in *Light Rigging Co.,* does not seek to insulate existing businesses from potential market saturation. It seeks, rather, to provide Connecticut consumers with the benefits of competition and the best possible cable television services. See, e.g., General Statutes § 16-331 (i) ("[e]ach certificate . . . issued pursuant to this section shall be *nonexclusive"* [emphasis added]). We conclude that, under this particular statutory scheme, the community, through the office of consumer counsel, is the appropriate party to raise any claims concerning "community needs."

The testimony presented to the legislature's committee on energy and public utilities supports this conclusion. For example, Michael Dorfsman, the executive director of the Connecticut Cable Television Association, linked the determination of future cable related needs to "customer satisfaction." Conn. Joint Standing Committee Hearings, Energy and Public Utilities, Pt. 1, 1990 Sess., p. 333. In arguing that No. 90-79 of the 1990 Public Acts, codified as General Statutes § 16-331 (h), would duplicate the existing needs assessment requirement pursuant to § 16-333-39 (c) (12) of the Regulations of Connecticut State Agencies, Dorfsman testified that a needs assessment asks questions such as, "how many channels are you offering? What would the customers want to see in terms of numbered channels? What types of programming would they want? . . . Are the rates reasonable? Are they satisfied with the quality of service that they're getting? What types of interactive services would they be interested in having?" Id., p. 221. Nowhere in the legislative history surrounding the

needs assessment provision codified as § 16-331 (h) is there any indication that the needs assessment is required so as to decrease the chance of market saturation and the potential harm competition would bring to existing providers. Rather, needs assessments are performed solely to increase the quality of cable television service for Connecticut consumers. Because the plaintiff is not within the zone of interests to be protected by § 16-331 (h), therefore, its interest has not been injuriously affected as a result of the department's decision to grant FiberVision a short period of time in which to finance a community needs assessment.

We conclude that existing cable television franchise holders are not included within the zone of interests sought to be protected by § 16-331 (b), (d) and (h). The plaintiff, therefore, cannot show an injury to a legally protected interest and consequently has no standing to raise violations under those statutory provisions with regard to the department's granting of a certificate of public convenience and necessity to FiberVision.

## II

The plaintiff next claims that, even if it is not directly within the zone of interests sought to be protected by § 16-331 (b), (d) and (h), this court is bound to review its claims under those statutes because of its aggrievement under subsection (i) of that statute. Because the trial court concluded that the plaintiff was aggrieved by an alleged violation of § 16-331 (i), the plaintiff argues, this court is required to review all issues raised by the plaintiff. Although none of the parties has questioned the trial court's determination that the plaintiff is aggrieved pursuant to § 16-331 (i), we review the court's underlying reasoning to clarify our discussion of the plaintiff's claim.

The legislature enacted No. 92-137 of the 1992 Public Acts (P.A. 92-137) for the purpose of allowing "any

municipality that owns or operates one or more plants for the manufacture or distribution of electricity" to "own or operate a community antenna television system." Public Acts 1992, No. 92-137, § 1, codified as General Statutes § 16-331 (i). By enacting P.A. 92-137, the legislature sought to stimulate the growth of competitive cable television markets in Connecticut by allowing municipalities to enter the market. 35 S. Proc., Pt. 4, 1992 Sess., pp. 1422–25. In response to concerns that municipalities would be provided with more advantageous franchise terms than their private competitors, the legislature included in P.A. 92-137 a "level playing field" provision, which mandates that "[e]ach certificate of public convenience and necessity for a franchise issued pursuant to this section shall be nonexclusive, and each such certificate issued for a franchise in any area of the state where an existing franchise is currently operating shall not contain more favorable terms or conditions than those imposed on the existing franchise. This subsection shall not apply to the length of the term of such certification as may be determined pursuant to [subsection (d) of this section]." Public Acts 1992, No. 92-137, § 5.[14]

As with § 13b-392, the statute at issue in *Light Rigging Co.*; see footnote 10; § 16-331 (i) requires the department specifically to take into account the existing franchise holder's interests when determining the terms

[14] In its brief, FiberVision argues that § 16-331 (i) only requires a level playing field when a municipality seeks to compete with a private cable company. While we agree after a review of the relevant legislative history that those participating in the legislative debates discussed only the effects of competition from municipalities; 35 S. Proc., Pt. 4, 1992 Sess., pp. 1422–25; 35 H.R. Proc., Pt. 13, 1992 Sess., pp. 4182–4226; we will not accept FiberVision's invitation to write a limitation into a statute that is unambiguous on its face. *Burnham* v. *Administrator*, 184 Conn. 317, 325, 439 A.2d 1008 (1981). The plain language of § 16-331 (i) applies to "[e]ach . . . certificate issued for a franchise in any area of the state where an existing franchise is currently operating . . . ." This language provides no ambiguity as to its reach.

and conditions under which a new franchise will be created. It envisions a level playing field so that an applicant for a new franchise does not enter the market at a competitive advantage. A new competitor's entry into a market under more favorable terms and conditions than those governing an existing competitor would represent the type of "unfair" or "illegal" competition that the existing competitor has standing to protest pursuant to §§ 4-183 and 16-35.[15] The plaintiff's interest in competing under comparable terms is a legally protected interest pursuant to § 16-331 (i). An allegation of a specific injury to this interest, therefore, can satisfy the second prong of the traditional aggrievement test. See *Light Rigging Co.* v. *Dept. of Public Utility Control,* supra, 219 Conn. 174.

The plaintiff asserts that the finding of standing as to this one issue necessarily required the trial court to consider the merits of each of its other claims. We disagree. Section 16-35 provides that "[a]ny . . . corporation . . . aggrieved by any order, authorization or decision of the department of public utility control . . . may appeal *therefrom* . . . ." (Emphasis added.) We are persuaded that this language allows an administrative appeal only as to those actions of the department by which a party has been aggrieved. As a general rule, the creation of competition alone does not create standing. The terms and conditions of a certificate of public convenience and necessity are dictated by that which "the public interest may require." General Statutes § 16-331 (a). An existing competitor may be aggrieved by the terms and conditions of a certificate only if, and to the extent that, the new certificate contains more favorable terms and conditions than its own certificate. General Statutes § 16-331 (i). Given this limited exception to the general rule, the scope of the substantive determination is limited by the scope of the standing

---

[15] See footnote 8.

that created it. See *New England Rehabilitation Hospital of Hartford, Inc.* v. *Commission on Hospitals & Health Care,* supra, 226 Conn. 124–25.

If the plaintiff or any other existing competitor were allowed to claim injury pursuant to § 16-331 (i) and then obtain judicial review of all claims arguably affecting competition, there would no longer be a general rule favoring free market competition. In this case, the plaintiff has established aggrievement only as to the level playing field provision and, therefore, may not appeal other issues as the court has no subject matter jurisdiction over those issues. See id., 124–25; *Red Hill Coalition, Inc.* v. *Town Planning & Zoning Commission,* 212 Conn. 727, 734, 563 A.2d 1347 (1989); *Mystic Marinelife Aquarium* v. *Gill,* supra, 175 Conn. 488–90.

III

Lastly, the plaintiff claims that the trial court improperly dismissed its claims raised pursuant to § 16-331 (i) on the ground that the plaintiff had failed to provide the court with an adequate record for review. The plaintiff claims pursuant to § 16-331 (i) that FiberVision's certificate contained more favorable terms than the plaintiff's certificate. In order to review the plaintiff's claim, the trial court obviously would have had to know the terms of the certificates of both FiberVision and the plaintiff. While FiberVision's certificate was included in the record, the plaintiff's certificate was not placed in the record at the administrative hearing.

The burden is on the appellant in an administrative appeal to present an adequate record for review by the trial court, as well as for review by this court. See Practice Book § 4061 ("[i]t is the responsibility of the appellant to provide an adequate record for review"); *Matza* v. *Matza,* 226 Conn. 166, 187, 627 A.2d 414 (1993) ("[w]e have repeatedly stated that it is the appellant's responsibility to provide an adequate record for review"

[internal quotation marks omitted]); *Griffin Hospital* v. *Commission on Hospitals & Health Care*, 200 Conn. 489, 502, 512 A.2d 199, appeal dismissed, 479 U.S. 1023, 107 S. Ct. 781, 93 L. Ed. 2d 819 (1986) (burden placed on appellant in administrative appeal to present an adequate record for review). Should an appellant find the record incomplete or inadequate at the trial court level, there exists a statutory vehicle through which the record can be supplemented. The plaintiff could have requested a rehearing, pursuant to § 4-183 (h),[16] at which it could have introduced its certificate into the record and asked the department specifically to consider its provisions in the context of the level playing field requirement. In this case, the plaintiff waived its opportunity to produce evidence of the terms of its certificate on several occasions. When FiberVision specifically pointed out that the plaintiff's franchise agreement was not included in the record, the plaintiff did not attempt to supplement the record. Additionally, when FiberVision specifically requested that the plaintiff's certificate be made a part of the record at the hearing before the department, the plaintiff objected to its inclusion, the objection was sustained and as a result of its own objection the plaintiff's certificate did not become a part of the record. Having failed to introduce the certificate into the record before the hearing on the administrative appeal, the plaintiff was not then entitled to an order from the trial court remanding the matter to the department for consideration of its certificate.

---

[16] General Statutes § 4-183 (h) provides: "If, before the date set for hearing on the merits of an appeal, application is made to the court for leave to present additional evidence, and it is shown to the satisfaction of the court that the additional evidence is material and that there were good reasons for failure to present it in the proceeding before the agency, the court may order that the additional evidence be taken before the agency upon conditions determined by the court. The agency may modify its findings and decision by reason of the additional evidence and shall file that evidence and any modifications, new findings, or decisions with the reviewing court."

The plaintiff argues, nonetheless, that the department had access to the plaintiff's certificate and should have reviewed it sua sponte, and thereby attempts to excuse its own failure to include its certificate in the record. Regardless of whether we agree with the plaintiff regarding the relative procedural duties of the department and the plaintiff in producing evidence at the agency level, a failure of the department at the administrative hearing would not excuse the plaintiff's failure to produce an adequate record for purposes of the administrative appeal. Pursuant to § 4-183 (i),[17] the plaintiff could have submitted proof of this alleged procedural irregularity to the trial court, thereby supplementing the record. See *Adriani* v. *Commission on Human Rights & Opportunities*, 220 Conn. 307, 325–26, 596 A.2d 426 (1991) (improper to deny appellant's motion to supplement agency record with evidence of alleged procedural irregularities). The plaintiff, however, failed to do so and consequently did not provide a record adequate for the trial court's review.

The plaintiff argues in the alternative that the record was adequate for the court to review its claimed error. While the record does not contain the plaintiff's certificate or its terms, the record does include a decision of the department on a 1988 application of the plaintiff for approval of a business reorganization. In that application, a business reorganization was proposed by the plaintiff and others whereby the plaintiff would obtain ultimate legal control over United Cable Television Corporation. As a means of facilitating the department's approval process, the merging companies, the office of consumer counsel and the attorney general filed a

---

[17] General Statutes § 4-183 (i) provides: "The appeal shall be conducted by the court without a jury and shall be confined to the record. *If alleged irregularities in procedure before the agency are not shown in the record* or if facts necessary to establish aggrievement are not shown in the record, *proof limited thereto may be taken in the court.* The court, upon request, shall hear oral argument and receive written briefs." (Emphasis added.)

voluntary agreement with the department.[18]

Without determining whether the trial court or the department may utilize reasonable substitutes for the certificate when performing the level playing field analysis, we conclude that the present reorganization agreement is not a reasonable substitute. The terms of the reorganization agreement incorporate a set of additional duties that the plaintiff had advanced in exchange for the department's approval of the reorganization that would have allowed the plaintiff to consolidate ownership of certain cable television franchises in Connecticut. It would frustrate one of the purposes of § 16-331, to provide consumers with the benefits of competition, if existing cable providers voluntarily could take on additional burdens in order to reap a future benefit and then have potential competitors bound by those new terms viewed in isolation without reference to the terms of the original certificate.

The two principal level playing field issues that the plaintiff has raised are the requirements to support public access television and the length of time provided each company to complete construction of its cable network.[19] The only mention of either of these issues in the plaintiff's reorganization agreement is a proposal that the plaintiff support three public access channels.

[18] According to the proposed agreement, United Artists Entertainment Company, the new holding company, agreed: to provide for system upgrades in the Hartford and Plainville/New Britain franchises; to dedicate three channels in each of the Connecticut United franchises to public, educational and government access, including providing funding for such; to comply with all applicable Connecticut statutes and regulations with respect to the provision of service; to provide funding to franchise advisory councils; and not to increase basic subscriber rates until May 1, 1989, and after this date limit the amount of increases based on system capabilities.

[19] Even if the plaintiff had presented its certificate to the department, its appeal from the department's decision pursuant to § 16-331 (i) would have been limited to those factors raised by the plaintiff and considered by the department. The plaintiff's claim on this appeal is not so confined, and we, therefore, need not consider it.

We find this single, vague duty imposed on the plaintiff to be insufficient to prove that a "more favorable" certificate was issued to FiberVision. A proper inquiry requires consideration of the entire package of terms and conditions required of both cable providers in order adequately to determine whether one has been favored over the other.

We conclude that the trial court properly dismissed the plaintiff's claims pursuant to § 16-331 (i) because of the plaintiff's failure to provide an adequate record from which the trial court could consider its claim that the department had violated § 16-331 (i).

The judgment is affirmed.

In this opinion the other justices concurred.